Martha GOODLATAW, Personal Representative and Special Administratrix for the Estate of Alvin A. Goodlataw, Decedent, Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, and Helen Beirne, Commissioner of Health and Social Services, Appellees.

No. S–279.

Supreme Court of Alaska.

April 26, 1985.

Robert M. Goldberg, Robert M. Goldberg & Associates, Anchorage, for appellant.

Elizabeth Page Kennedy, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

### I. STATEMENT OF THE FACTS

This case involves a wrongful death action brought by Martha Goodlataw on behalf of Alvin Goodlataw, her son, now deceased. A jury declared him presumed dead "as a result of undetermined causes" after he disappeared from a rural camp where he had gone to work soon after being sentenced for unlawful entry.

Alvin Goodlataw had a history of alcohol abuse and resultant misconduct. On December 12, 1976 he was arrested and charged with unlawful entry in violation of AS 11.20.135(a). At the time of his arrest he had been drinking; he and a companion had broken into the home of the latter's sister in search of a place to sleep. After his arrest Goodlataw was imprisoned in the Glenallen jail for a day. The next day he was brought before Magistrate Sheldon Sprecker for arraignment. Goodlataw pleaded guilty at the hearing. The magistrate imposed a sentence of 30 days, with 28 days suspended on the condition that Goodlataw report within two weeks to Craig Anderson, an alcoholism rehabilitation counselor at the Copper River Native Association, for evaluation of his drinking problem. Goodlataw was given credit for two days already served and ordered to make restitution.

On February 3, 1977 Goodlataw appeared before acting magistrate Janet B. Harris for a decision on the recommendations of the alcoholism rehabilitation counselor. The counselor recommended: (1) that Goodlataw have a thorough physical examination with emphasis on ulceration and possible liver dysfunction, vitamin deficiency, and hypoglycemia, all resulting from habitual use of alcohol; (2) that he undergo long-term treatment, for at least six months, in a therapeutic center; (3) that he spend another five days in jail, if necessary, to sober up before going to a halfway treatment house if he were still unemployed; (4) that he meet with an alcoholism counselor at least once a week; and (5) that he attend two Alcoholics Anonymous meetings per week. Anderson also stated that Goodlataw had told him that his longest periods of sobriety in two years had been no longer than two weeks at a time.

Magistrate Harris stated that Goodlataw should get a physical at the ANS Hospital in Anchorage and then go to the Halfway House or the Studio Club in Anchorage. She asked if Goodlataw could get to Anchorage and Goodlataw replied that he could. The magistrate also told him that the court could not pay for his stay at the Halfway House or at the Studio Club. The magistrate informed Goodlataw that if he did not report to either the Studio Club or the Halfway House, the court would impose the 28-day suspended sentence. Goodlataw did not inform the magistrate that he lacked the funds for the trip or the treatment.

On about February 5, 1977 Goodlataw spoke with Frank Pease, who had hired Goodlataw in the past to work at an isolated horse camp. Pease and Goodlataw went to see Magistrate Sprecker to get permission for Goodlataw to go to work at the horse camp. Goodlataw told Magistrate Sprecker that he did not want to go to the detoxification center, because the horse camp job was out in the Bush and there would be no alcohol available there. Goodlataw told Magistrate Sprecker that he had had a couple of drinks the evening before; however, Magistrate Sprecker has testified that Goodlataw appeared fine in court.

Magistrate Sprecker agreed to allow Goodlataw to go to the horse camp on these conditions: (1) that he submit to a physical examination by Dr. Pinneo and receive permission from him to go to work at the camp; and (2) that he agree to complete the detoxification program in Anchorage after he returned. Dr. Pinneo determined that Goodlataw was healthy enough to take care of himself in the Bush. He gave Goodlataw a supply of vitamins and tranquilizers.

On February 6 Goodlataw was flown to the horse camp. The pilot testified at the inquest that Goodlataw had appeared "hung over" but not drunk or mentally confused. On February 7 Magistrate Harris advised Anderson, the alcoholism counselor, that Goodlataw would not report for detoxification until after his return from the horse camp.

On March 9, 1977 Goodlataw was reported missing and state troopers began to search the area of the camp. He was never found. On October 30, 1979 a jury declared Goodlataw presumed dead "as a result of undetermined causes." AS 09.55.-030.

In an affidavit dated July 14, 1983 Anderson stated that if the court had contacted him when deciding whether to permit Goodlataw to fly to the horse camp, Anderson would have objected. He stated that if Goodlataw did not have something to drink within 48 hours, Goodlataw would likely have gone into delirium tremens. Anderson also observed that Goodlataw functioned at the level of a 12-to-15-year-old. He further stated:

> I am still troubled as to why the District Court didn't send for me when the horse camp proposal was raised. The magistrate knew where I lived. I always told him that if you've got a problem with something I recommend, and you need to get hold of me quick, just send a State Trooper out and I will find a way to work with the Court. I understand that sometime these things happen so I really don't understand why I wasn't contacted. I would have protested about what they proposed to do with Alvin. The Troopers knew who I was and where I lived and so did the magistrate.

## II. STATEMENT OF PROCEEDINGS

Martha Goodlataw, as personal representative and special administratrix for the estate of Alvin Goodlataw, filed a complaint in the superior court. AS 09.55.570; AS 09.55.580. She alleged that he was denied his statutory (AS 33.30.020) and constitutional rights to alcoholism rehabilitation. She further alleged that the Commissioner and the Department of Health and Social Services ("Department") had a responsibility to provide alcoholism rehbilitation for Goodlataw and that their failure to do so proximately caused his death. The Department and its Commissioner moved for dismissal on the ground that any such

negligence was not the proximate cause of Goodlataw's death. After a hearing, the State also filed a Motion for Summary Judgment arguing (1) that the Department was immune from any alleged liability on the basis of AS 09.50.250; (2) that any alleged breach of duty was negated by intervening judicial acts; and (3) that Goodlataw was not denied any constitutional or statutory right to alcoholism rehabilitation.

At a hearing on September 16, 1983 the superior court ruled that there was no breach of any legal duty owed to Goodlataw and that there was no showing of proximate causation. The superior court granted the defendants' Motion for Summary Judgment and Motion to Dismiss on September 19, 1983.

## III. DISCUSSION

A. Goodlataw was not deprived of his constitutional right to treatment as a prisoner.

Mrs. Goodlataw argues that Goodlataw was an incarcerated prisoner and that as such he had a right to alcoholism rehabilitation under the Alaska Constitution and United States Constitution, and that he was denied this right.

 Incarcerated prisoners clearly have a constitutional right to have their medical needs met. In *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976), the U.S. Supreme Court stated that the "elementary principles [of the cruel and unusual punishment clause of the Eighth Amendment] establish the government's obligation to provide medical care for those whom it is punishing by incarceration." The court reasoned:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," .... In

less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common view that "It is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

*Id.* 429 U.S. at 103–04, 97 S.Ct. at 290–91, 50 L.Ed.2d at 259–60.

The court further stated that in order for a prisoner to show that his Eighth Amendment rights were violated, the prisoner must demonstrate that there was a "deliberate indifference" to his serious medical needs. According to the court, such indifference would constitute " 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* 429 U.S. at 105, 97 S.Ct. at 291, 50 L.Ed.2d at 260.

*Estelle* was based on the principle that prison officials should care for those who, because of imprisonment, cannot care for themselves. Applying this principle to the situation of a brief detainee, simple decency indicates that someone with a broken bone or someone threatening suicide should be given the medical treatment necessary to prevent immediate harm. Such treatment is "protective" of the prisoner rather than rehabilitative.

When the detention is brief, as in this case, rehabilitation is not an applicable duty. Rehabilitation implies a therapeutic program of working *over a period of time* to correct a complex problem. The time necessary for rehabilitation is simply not present when a detainee is in the custody of the Department for only one day.[1] To require rehabilitative, as opposed to protective, efforts in the situation of a brief detention might suggest that the state should retain custody of all alcoholics and emotion-

---

1. In *Abraham v. State*, 585 P.2d 526, 534 (Alaska 1978), the dissenting justices pointed out that a right to a rehabilitation program applies to a prisoner incarcerated for "a substantial period of time" and that a period of "only a few months" is "too short for the institution of any

meaningful program." While it is possible that a few months of intensive treatment might be helpful in some cases, one day is simply too short a period in which to institute an effective program.

ally disturbed individuals until they are "cured."

In *Abraham v. State*, 585 P.2d 526, 533 (Alaska 1978), Abraham was imprisoned for one year for a crime committed in a drunken rage. We stated that he was entitled to rehabilitative treatment, including alcoholism counseling. Our decision was based, in part, on the objectives of article I, § 12 of the Alaska Constitution. As we noted in *Abraham*, "one of the objectives of art. I, § 12 of the constitution dealing with penal administration was the 'rehabilitation of the offender into a noncriminal member of society.' " *Id.* at 530.

In the instant case, Goodlataw was imprisoned for only one day before arraignment and was then given a suspended sentence. The evidence shows that, in the twenty-three hours that Goodlataw was in the custody of the Department of Health and Social Services, the Department provided for his safety and welfare, and allowed him to dry out as much as possible.

■ We find that twenty-three hours is insufficient time to institute an effective program. We also find that the Department of Health and Social Services was not deliberately indifferent to Goodlataw's medical needs when it failed to institute alcoholism rehabilitative treatment during the hours of his imprisonment. Given the brevity of his confinement, Goodlataw was not denied a constitutional right to alcoholism rehabilitative treatment.

■ Furthermore, we find that Goodlataw was not constitutionally entitled to alcoholism rehabilitative treatment after his release. The duty to provide a rehabilitation program arises from the fact that a prisoner is not at liberty to obtain treatment himself. Once released, Goodlataw was not deprived of his liberty to seek rehabilitation.

B. AS 33.30.020 does not require that the Department of Health and Social Services provide alcoholism rehabilitation to persons released from incarceration.

■ Mrs. Goodlataw asserts that AS 33.-30.020, which requires the Department to meet the medical needs of prisoners, also requires the Department to meet those same needs after prisoners are released. She argues that because Goodlataw was imprisoned, however briefly, it became the responsibility of the Department to provide alcoholism rehabilitation during his confinement and after his release.

AS 33.30.020 provides:

The commissioner shall establish prison facilities and classify the prisoners in prison facilities. The commissioner shall provide for the safety, subsistence, proper government, and discipline of prisoners. The commissioner shall establish programs for the treatment, care, rehabilitation and reformation of prisoners.

AS 33.30.900(6) defines prisoner as:

"Prisoner" means a person detained or confined for any period of time in a prison facility, whether by arrest, conviction, order of court or a person held as a witness, or otherwise;

Clearly, the statute imposes a duty on the Department only with regard to individuals detained or in custody. Again, the brief period during which Goodlataw was imprisoned was insufficient time to institute effective treatment of his alcoholism. Therefore, the Department was not required by AS 33.30.020 to provide such treatment. A contrary holding would lead to absurd results. The prospect of excessive state intrusion into the lives of brief detainees (retaining some control of them until they are "cured") and the incalculable costs of trying to reform every alcoholic briefly detained by law enforcement authorities, are but two reasons for us to distinguish between a duty to protect and a duty to rehabilitate in cases of very brief incarceration.

C. Goodlataw, as a rural Alaskan, was not denied equal protection of the law.

■ Mrs. Goodlataw asserts that Goodlataw was denied equal protection of the law. She argues that under AS 47.37.020 *et seq.*,

it is the responsibility of the Department to establish alcoholism rehabilitation programs *throughout* the state. She argues that urban Alaskans have far greater access to live-in alcoholism rehabilitation programs than do rural Alaskans. She further argues that if Goodlataw had had access to an alcoholism rehabilitation program near his home community, he would not have had to go to Anchorage and thus he would not have gone to the horse camp.

In *State v. Reefer King Co., Inc.*, 559 P.2d 56, 65 (Alaska 1977), we stated that:

> [A]n individual who claims that selective enforcement has deprived him or her of equal protection under the state constitution must show "a deliberate and intentional plan to discriminate," based upon some unjustifiable or arbitrary classification. There is a similar requirement for proof of a violation of equal protection rights under the federal constitution. *See Mackay Telegraph and Cable v. Little Rock*, 250 U.S. 94, 39 S.Ct. 428, 63 L.Ed. 863 (1919).

No selective enforcement of the law has been shown here. George Mundell, the acting coordinator of the Department of Health and Social Services Office of Alcoholism and Drug Abuse, explained the procedure for the funding of alcoholism rehabilitation programs in his affidavit. He stated that a prerequisite to selecting a program site is that local interest be expressed and that an application for grant-in-aid funds be submitted to the Office. He also stated that the Office of Alcoholism and Drug Abuse had previously funded treatment programs for outpatients in the Copper River Basin area. However, it was not until February 1984 that an application was submitted for a resident *inpatient treatment* program in the Copper River Basin area. Since no application was submitted before 1984, no evidence of an intentional plan to discriminate was presented.

As for the claim that the Department violated Goodlataw's right to equal protection under the federal constitution, the U.S. Supreme Court has said that "the equal protection clause relates to equal protection of the laws between persons as such rather than areas." *Griffin v. School Board of Prince Edward*, 377 U.S. 218, 230, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256, 264 (1964). In *Griffin*, the school board had closed the county public schools in order to avoid a desegregation order. The court concluded that the school board's action denied the plaintiffs equal protection of the laws because the clear reason behind the shutting of the schools was to prevent the racial integration of the county's school children. The court stressed that "[w]hatever non-racial grounds might support a State's allowing a county to abandon public schools," the grounds must be constitutional, and opposition to racial integration does not qualify as constitutional. *Id.* 377 U.S. at 231, 84 S.Ct. at 1233.[2]

■■■ Absolute uniformity of the laws throughout a state is not constitutionally required, nor is uniform implementation of programs throughout the geographic regions of a state. *Weber v. City of Sachse*, 591 S.W.2d 563 (Tex.1979); *Young v. Byrne*, 144 N.J.Super. 10, 364 A.2d 47 (1976). Absent some invidious discrimination based on a suspect classification, equal protection under the U.S. Constitution requires only that a state or local government have a rational basis for providing different levels of services to different parts of the state or locality. In this case it would be impractical for the state to implement a resident-inpatient program of alcoholism rehabilitation in every community within the state. It is not unreasonable for the Department of Health and Social Services to require that a community must *apply* for an inpatient alcoholism-treatment program before the Department will under-

---

**2.** *See also McGlothlen v. Department of Motor Vehicles*, 71 Cal.App.3d 1005, 140 Cal.Rptr. 168 (1977). The *McGlothlen* court ruled that legislative classification as to treatment and procedure within a state judicial system according to factors such as geographic area, population, or other relevant considerations, does not deny equal protection of the laws under the federal constitution unless such classification is shown to be clearly arbitrary and unreasonable.

take to provide such services.[3] Thus, since the plaintiff has presented no allegation of total arbitrariness or discrimination based on a suspect classification, the federal equal protection argument must fail.

## IV. CONCLUSION

We find that the Department of Health and Social Services and its Commissioner did not deny Goodlataw his constitutional right to alcoholism rehabilitation, nor did it deny him equal protection. We also find that the Department did not breach any statutory duty to provide him with alcoholism rehabilitative treatment during his confinement or after his release. If Goodlataw had been sentenced to imprisonment for a substantial length of time, a duty to provide alcoholism rehabilitation during confinement would have arisen. However, the statutory duty to provide medical treatment or alcoholism counseling runs only to prisoners. Once Goodlataw was released by the magistrate, the Department of Health and Social Services had no duty to provide alcoholism rehabilitative treatment.

Because there was no breach of duty, and no violation of Goodlataw's constitutional rights, while he was confined or after he was released, we decline to discuss the apparent lack of evidence of proximate causation in this case.

We therefore conclude that the motions for summary judgment and dismissal were properly granted.

AFFIRMED.

COMPTON, Justice, concurring.

I agree with the result reached by the court, but cannot subscribe to the court's reasoning regarding the "cruel and unusual punishment" and "right to rehabilitation" claims. As far as Alaska law is con-

cerned, the genesis of both claims is art. I, § 12 of the Alaska Constitution. Both Goodlataw and this court fail to distinguish between the separate commands embodied in art. I, § 12. The result is flawed analysis which cannot provide guidance for future actors, be they agency administrators or private litigants. Rather, it can only lead to confusion.

The problem begins with the court's discussion of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). That case requires that a prisoner demonstrate his keepers' "deliberate indifference" to serious medical needs in order to make out a violation of the Eighth Amendment prohibition against cruel and unusual punishment.[1] 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260. The court explains that *"Estelle* was based on the principle that prison officials should care for those who, because of imprisonment, cannot care for themselves." *Opinion* at 1193. The court goes on to say that the prohibition against cruel and unusual punishment, as it relates to brief detainees, requires only "protective" steps rather than rehabilitative measures. *Opinion* at 1193–1194. At this point the court errs in its analysis because it interweaves two principles that are textually and conceptually distinct in Alaska's Constitution. Art. I, § 12 provides:

> *Excessive Punishment.* Excessive bail shall not be required, nor excessive fines imposed, nor [1] cruel and unusual punishments inflicted. Penal administration shall be based on the [2] principle of reformation and upon the need for protecting the public.

The mixing of apples and oranges, to use an outworn phrase, is confirmed when the court sums up its remarks on the constitutional right to treatment by stating: "We also find that the Department of Health

---

**3.** It may well be that the Department should consider doing more to actively *encourage* rural communities to apply for inpatient alcoholism-treatment programs, especially in light of the state's access to community-by-community data on alcohol-related offenses. *See* the National Council on Alcoholism's report entitled "Executive Summary of Alcohol Misuse and Alcohol-

ism in Alaska," part of which is quoted in *Abraham,* 585 P.2d at 532–33 n. 19.

**1.** U.S. Const. amend. VIII provides:
*Bails, fines and punishments.* Excessive bails shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

and Social Services was not *deliberately indifferent* to Goodlataw's medical needs when it failed to institute *alcoholism rehabilitative treatment* during the hours of his imprisonment." *Opinion* at 1194 (emphasis added). Why was the Department not deliberately indifferent to Goodlataw's medical needs? We are instructed, in so many words, that the Department could not have instituted an effective alcohol rehabilitation program in the short time span Goodlataw was in custody. *Id.* This is, of course, undeniable and Goodlataw nowhere suggests that the Department could have done so. The problem with the conclusion lies in its misapplication of principles: "deliberate indifference" is not a test to determine whether a right to rehabilitation exists; it is solely a test to determine whether cruel and unusual punishment has been inflicted.

We further learn from the court's opinion that the state's duty to provide rehabilitative treatment arises from the fact that a prisoner is not at liberty to obtain treatment himself. *Opinion* at 1193. This is certainly *not* the same as a duty arising to "make the constitutional right to reformation a reality...." *Abraham v. State*, 585 P.2d 526, 533 (Alaska 1978). In *Abraham*, the court was careful to keep separate the constitutional prohibition against cruel and unusual punishment and requirement that penal administration be based in part on reformation. In that case, the court sustained Abraham's right to rehabilitation, particularly with respect to alcohol consumption, in order to realize his right to reformation. On the facts, however, his cruel and unusual punishment claim was rejected.[2]

It is true that Gamble and Abraham were incarcerated. No authority is cited, however, for the proposition that reformation, i.e., rehabilitation, of the offender ends at the prison gates. The court expresses concern over state intrusion into the lives of brief detainees, and costs incurred if the state has to "cure" all of them. *Opinion* at 1194. I cannot find any estimate of costs in the record. As for intrusion, some "brief detainees," those who are quickly released on posted bail or their own recognizance, face years of state intrusion into their lives in the form of probation. I suggest that probation and parole, supervised by and large by employees of the Department, are directed at rehabilitating a criminal defendant to the same extent as providing a defendant with rehabilitation programs within the confines of a "correctional" institution.

The two questions which someday may be properly before this court, supported by an adequate record, are (1) whether the Department may permit someone committed to its custody to go off into the woods to a predictable and certain death, and (2) whether the right to rehabilitation is one of constitutional dimension afforded to all those whose freedom is restricted by probation and parole releases, or simply one of convenience so that we can say we did something for prisoners. In my view, neither of these issues is properly before this court in this case, and by answering them without an adequate record and briefing we err.

Alvin Goodlataw had a brief sojourn in the state's custody. His custody was committed to the Department on December 13, 1976, but Magistrate Sprecker, on February 5, 1977, deferred further implementation of the sentence and permitted Goodlataw to go off to the horse camp alone and unattended. From that point until the sentence and judgment were to be reinstated, Goodlataw was quite effectively removed from the Department's custody and responsibility.[3] I conclude that the Department

---

2. Abraham, a Yupik Eskimo, was sentenced to five years in prison, four suspended, for beating his wife to death while drunk. Imposition of the sentence required his removal from the Bethel community and Abraham claimed he would be deprived of his natural diet and isolated because he spoke only the Eskimo Yupik language. The court found nothing cruel nor unusual in the sentence.

3. I can find no evidence in the record that the Department of Health and Social Services was ever notified that Alvin Goodlataw had been committed to its custody. Craig Anderson was

owed Goodlataw no duty during that interlude, or if it did, that there is no showing that any breach of duty proximately caused Alvin Goodlataw's death.[4]

In other respects I agree with the court's decision.

an employee of the Copper River Native Association, publicly funded in part, but privately operated nonetheless.

4. Goodlataw does not claim that the Department was remiss in not seeking to have Magistrate Sprecker overrule himself and order Goodlataw's immediate return.