PATRICIA S. HELMLY, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF
HER DECEASED HUSBAND, VERNON RALPH HELMLY v. THOMAS E. BEB-
BER, SHERIFF OF ALEXANDER COUNTY, NORTH CAROLINA, HARRY ROB-
ERTSON, CECIL R. FRY AND HERSHELL TEAGUE, COMMISSIONERS OF
ALEXANDER COUNTY, NORTH CAROLINA, AND ALEXANDER COUNTY, NORTH
CAROLINA

No. 8422SC1347

(Filed 15 October 1985)

Sheriffs and Constables § 4; Convicts and Prisoners § 3— suicide of inmate—
wrongful death action—summary judgment for sheriff improper—summary
judgment for county proper

Summary judgment should not have been granted for defendant sheriff in
a wrongful death action arising from the suicide of plaintiff's husband in the
sheriff's jail, but summary judgment was correctly granted for the county and
the county commissioners, where plaintiff's forecast of evidence showed that
plaintiff told the dispatcher that her husband had checked out of the
psychiatric ward at a hospital that morning for drug abuse, was crazy, and was
dangerous to himself and others; plaintiff told sheriff's deputies that defendant
was dangerous to himself and others; plaintiff's daughter told a lieutenant that
her father was in a very bad condition, needed mental help, and was
dangerous to himself and others; and one or both of the officers who arrived at
plaintiff's house were aware that plaintiff's husband was drunk, had beaten his
wife and daughter and was headed up the stairs toward his wife and children
with a cinder block raised above his head when a lieutenant stopped him, had
torn up the house, had rammed his truck into the house, and showed concern
only for his pickup truck. Plaintiff was not required to use the magic word
"suicide" in order to get to the jury.

APPEAL by plaintiff from *Collier, Judge*. Order entered 8 Oc-
tober 1984 in Superior Court, ALEXANDER County. Heard in the
Court of Appeals 21 August 1985.

*Randy D. Duncan for plaintiff appellant.*

*David P. Parker for defendant appellees.*

COZORT, Judge.

On 24 November 1982, plaintiff's husband committed suicide
in the Alexander County Jail by hanging himself with his belt
from the cell bars. On 15 May 1984 plaintiff filed an amended com-
plaint in this wrongful death action alleging that defendants were
negligent in failing to take reasonable measures to prevent her
husband's suicide. Defendants moved for summary judgment on

24 July 1984. The motion was granted by Judge Collier on 8 October 1984. We reverse in part and affirm in part.

A forecast of plaintiff's evidence tends to show the following:

On Monday, 22 November 1982, plaintiff's husband, Vernon Helmly (hereinafter "Helmly"), voluntarily entered the psychiatric ward of Catawba Memorial Hospital for drug abuse treatment. On Wednesday morning, 24 November 1982, against his doctor's and wife's wishes, he discharged himself from the hospital. Upon his discharge, Helmly repeatedly called his wife at work and later at home asking her to pick him up and bring him home. Eventually, Helmly got a ride home around 6:10 p.m.

Prior to her husband's returning home, plaintiff called Robert P. Davis, Magistrate for Alexander County, and inquired about having him committed. Plaintiff told Magistrate Davis that her husband had checked out of the psychiatric ward of Catawba Memorial Hospital against his doctor's wishes; that he had been drinking; that he had been on drugs; and that he was "dangerous to himself and others." Davis advised plaintiff that since her husband was currently in an adjacent county (Catawba), she would have to call the Catawba County Magistrate.

When Helmly arrived home around 6:10 p.m., he was drunk and wanted the keys to his truck. When plaintiff would not give him the keys, he became belligerent and started breaking and throwing dishes and furniture. Helmly beat his wife and daughter Kathey. Plaintiff went next door to her neighbor's house and called the sheriff's department. Plaintiff spoke with the dispatcher, gave him her name and address, and told him (1) her husband had checked out of the psychiatric ward at Catawba Memorial Hospital that morning for drug abuse; (2) he was very dangerous and was breaking everything in the house; (3) she was scared to death and her husband was crazy. Plaintiff talked with the dispatcher between three and five different times before sheriff's deputies arrived at her house. Sometime during these conversations she told the dispatcher that her husband was "dangerous to himself and others" and that her husband, who by now had obtained the keys to the truck, was ramming the truck into the house. Helmly had driven the truck repeatedly into their car pushing the car through a garage wall and had rammed the truck into the house.

Lt. Gerald Dial of the Sheriff's Department arrived at the scene at approximately 7:02 p.m. At the Helmly residence Lt. Dial saw that the front of the pickup truck was damaged, the back of the car was badly damaged, and the back wall in the garage had a big hole in it. Lt. Dial observed Mr. Helmly standing at the front door of the residence with a cinder block in his hand. Helmly had broken the window out beside the door. Helmly's son was trying to keep Helmly from reaching inside the window. Before Lt. Dial got to Helmly, Helmly had gotten the front door open and was going up the stairs with the cinder block raised above his head with both hands. Lt. Dial saw Helmly's wife, daughter, and son at the top of the stairs. Lt. Dial noticed that Mrs. Helmly's face was bloody and Kathey Helmly had some blood or bruises on her. Lt. Dial overtook Helmly just before he got to the top of the stairs. Lt. Dial calmed Helmly and took him into custody.

Another officer, Deputy Chris Bowman, and an ambulance arrived a few minutes later. Deputy Bowman went to the patrol car where Helmly was seated and started talking to Helmly. Deputy Bowman noticed Helmly had blood on his hands, and he asked Helmly if he needed the EMTs to take a look at him. Helmly said he did not want the EMTs to look at him. Deputy Bowman could smell a strong odor of alcohol about Helmly. Helmly asked Deputy Bowman how bad his pickup was damaged. Helmly told Deputy Bowman that he had run his truck into the back of the car and that he had run the truck into the house. Deputy Bowman told Helmly that the front end of the truck had been damaged and that "seemed to satisfy" Helmly, though he was still mad at his family.

Plaintiff was taken to the hospital. At the hospital, plaintiff's daughter told Lt. Dial that her father was in "a very bad condition," he needed "mental help," and he was "dangerous to himself and others." Plaintiff maintains that she also told the deputies that her husband was "dangerous to himself and others."

Once Helmly was taken into custody he was brought before Magistrate Davis for a bail hearing and commitment proceeding at approximately 8:45 p.m. He was charged with assault on a female and assault inflicting serious injury and was placed in cell D-1, the "drunk tank." Bond was set at $500. At that time, Helmly was the sole occupant of cell D-1, and the only jailer on duty was

Loy Hensley, the radio dispatcher, although there were other deputies in the office. The cell block was not visible from the office or from the radio dispatch center where Hensley was stationed. A closed-circuit monitoring system had been installed in the jail but was not functioning at the time.

Prior to plaintiff's arrival at Magistrate Davis's office, Lt. Dial related to the magistrate plaintiff's desire to see about getting Helmly psychiatric treatment. Plaintiff arrived at the Sheriff's office from the hospital between 9:50 and 10:15 p.m. and proceeded to the magistrate's office with her son, her daughter, and a neighbor. During the discussion with the magistrate, plaintiff, as well as her neighbor, Sharon Cruzan, related to the magistrate the troubled history of Mr. Helmly.

Mrs. Cruzan told Davis of Helmly's recent threats of suicide. Plaintiff related her husband's history of alcoholism and psychiatric treatment and expressed her opinion that he was suicidal. Plaintiff admits this was the first time she had told any law enforcement figure that her husband might try to commit "suicide."

During the discussion with the magistrate, a groan was heard from the cell block area. Magistrate Davis remarked "Well, Vernon [Helmly] must be waking up." Helmly had been "hollering" off and on since he had been placed in the cell at approximately 9:00 p.m. At about 10:25 p.m., Officer Stan Durmire went to the cell block door and called to Helmly. At the earlier bail hearing, the prisoner had indicated his desire to remain at the jail overnight; now he told Durmire he "wanted out of the jail." Durmire responded that he would "check on seeing about getting him out." At about the same time, the meeting in Davis's office concluded, and plaintiff and the others left.

Durmire was met by the magistrate, who informed him and the other deputies of plaintiff's statements that Helmly was suicidal. Officers Durmire and Hensley returned to the cell, where, at approximately 10:38 p.m., they found the prisoner hanging by his belt from the cell bars. Lt. Dial and others were called to assist in loosening the tension on the belt by holding Helmly up while Officer Hensley returned to the office to obtain keys to the cell and to notify emergency medical personnel stationed across the street. The EMS unit arrived approximately one minute later. The two members of the EMS squad cut down the belt and began

Helmly v. Bebber

cardiopulmonary resuscitation on Helmly. The prisoner was pronounced dead at Alexander County Hospital at approximately 11:22 p.m.

The trial court granted summary judgment for all defendants, including Alexander County, the Commissioners of Alexander County, and the Sheriff of Alexander County. On appeal, neither the plaintiff nor the defendants attempt to make distinctions among the three specific defendant entities and the obligations and duties imposed on each. In the briefs, however, both plaintiff and defendants have concentrated on the defendant sheriff and his duty to the plaintiff's husband. Thus, the primary issue to be determined on this appeal is whether the plaintiff forecast sufficient evidence to go to the jury on the question of whether the sheriff was liable for negligently failing to keep Helmly from harming himself. To properly decide that issue, we must first analyze the duty of care owed by a sheriff to his prisoners. A recent annotation described the general rule as follows:

> In accordance with the general rule that a duty of reasonable care is owed by prison or jail authorities to a prisoner to keep him safe from unnecessary harm, the courts which have considered the question . . . have generally recognized that if such authorities know or have reason to believe that the prisoner, unless forestalled, might do harm to himself or to others, reasonable care must be used by those authorities to assure that such harm does not occur.

Annot., 79 A.L.R. 3d 1210, 1214 (1977).

Whether a sheriff may be held liable under the theory of negligence for the suicide of a prisoner in his custody does not appear to have been squarely decided in this jurisdiction. In *Dunn v. Swanson*, 217 N.C. 279, 7 S.E. 2d 563 (1940), however, our Supreme Court held that the plaintiff had stated a cause of action when she alleged that the sheriff was negligent for placing her weak, sick and helpless husband in a cell with a violently insane man who during the night killed him by beating him with a leg torn from a table which had been left in the cell by the sheriff and jailer.

Likewise, in *Hayes v. Billings*, 240 N.C. 78, 81 S.E. 2d 150 (1954), the court held that a cause of action had been stated against the Sheriff in a wrongful death action by allegations that: (1) the sheriff had incarcerated the decedent with full knowledge on the part of the defendant Sheriff that the decedent was without his mental capacity and had no knowledge as to his acts and was likely to do violence to himself because of his mental condition; (2) the Sheriff failed to lock the decedent in a place of safety but permitted him to be free in a dangerous and hazardous place, knowing full well, or being in a position where he should have known, that the decedent was likely to suffer death or great bodily harm because of the hazardous condition with respect to a well or open space in the jail's upstairs hallway where the decedent had been left free to roam; and (3) the decedent had fallen from the upstairs hallway of the jail to the concrete floor below, sustaining injuries from which he later died.

More recently, in *Williams v. Adams*, 288 N.C. 501, 219 S.E. 2d 198 (1975), the Supreme Court held that a complaint against a sheriff should not have been dismissed when it claimed the decedent's wrongful death was caused by the negligence of the sheriff's officers in not providing proper medical attention. In that case, Justice Moore stated the following:

> [T]he author of a note in 19 N.C. L. Rev. 101 (1940-1941) states that *Dunn v. Swanson, supra,* is in accord with the general rule that "a prison official is liable when he knows of, or in the exercise of reasonable care should anticipate, danger to the prisoner, and with such knowledge or anticipation fails to take the proper precautions to safeguard his prisoners."

*Id.,* 288 at 504, 219 S.E. 2d at 200.

These cases compel our holding that the standard of reasonable care is applicable in cases involving the suicide of a prisoner. Whether the custodian of the jail has reason to believe the prisoner might harm himself and has exercised reasonable care to prevent such harm are normally questions of fact for the jury:

> In determining whether, in cases involving actions for damages arising out of a prisoner's self-inflicted injuries or suicide, jail or prison authorities have executed their duty of

reasonable care to keep a prisoner safe and free from harm, the courts have recognized that certain factors, such as the prisoner's mental state — whether he was sane or insane, severely depressed, psychotic, or evidencing other symptoms of mental disturbance — or his physical condition — whether he was drunk, and if so, whether he was in a competely helpless state — are to be taken into consideration. It has been held that the drunkenness of the prisoner affects the degree of care owed to the extent that the jail or prison authorities must be mindful of his helpless condition in their treatment of him and must recognize that one in such a state cannot exercise even that ordinary care for his own safety which is expected of a reasonable person. Similarly, where a prisoner's mental condition is substantially impaired and the authorities know or should know this fact, the courts have determined that what would constitute the reasonable care of the prisoner demanded by law depends on the circumstances of the given case, and have indicated that whether the amount of supervision provided for the prisoner was adequate, and whether the articles left with the prisoner could naturally be assumed to be used as instruments of suicide, were questions to be decided by the jury.

Annot., 79 A.L.R. 3d 1210, 1214-15 (1977).

Since "it is usually the jury's perogative [sic] to apply the standard of reasonable care in a negligence action, . . . summary judgment is . . . appropriate only in exceptional cases where the movant shows that one or more of the essential elements of the claim do not appear in the pleadings or proof at the discovery stage of the proceedings." *Ziglar v. E. I. Du Pont De Nemours and Co.,* 53 N.C. App. 147, 150, 280 S.E. 2d 510, 513, *cert. denied,* 304 N.C. 393, 285 S.E. 2d 838 (1981). Thus, when defendants moved for summary judgment in this case they undertook the burden of showing that plaintiff would not be able to prove at trial the essential elements of her negligence claim: "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach; and (4) loss because of the injury. [Citation omitted.]" *City of Thomasville v. Lease-Afex, Inc.,* 300 N.C. 651, 656, 268 S.E. 2d 190, 194 (1980).

In this case defendants argue that plaintiff has not come forward with sufficient evidence that Helmly's "suicide" was foreseeable, that is, plaintiff's evidence is not sufficient to show that defendants knew or should have known that Helmly might harm himself. Foreseeability of injury is an essential element of proximate cause. *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161 (1970). Proximate cause is a jury question. *Jones v. Horton,* 264 N.C. 549, 142 S.E. 2d 351 (1965). Defendants argue that "[s]tating the term . . . 'dangerous to himself and others' was insufficient to make the deputies aware that Helmly was suicidal."

The forecast of plaintiff's evidence, if believed by the jury, shows that:

1. Plaintiff told the dispatcher that her husband had (a) checked out of the psychiatric ward at Catawba Memorial Hospital that morning for drug abuse; (b) he was crazy, and (c) he was "dangerous to himself and others";

2. Plaintiff told the sheriff's deputies defendant was "dangerous to himself and others";

3. Plaintiff's daughter told Lt. Dial her father (a) was in "a very bad condition," (b) needed "mental help" and (c) was "dangerous to himself and others";

4. One or both of the officers that arrived at plaintiff's house were aware that Helmly (a) was drunk, (b) had beat his wife and daughter and was headed up the stairs towards his wife and children with a cinder block raised above his head when Lt. Dial stopped him, (c) had torn up the house, (d) had rammed his truck into the house, and (e) showed concern only for his pickup truck.

This is sufficient evidence from which a jury could reasonably infer that the sheriff's deputies had been put on notice that Helmly might harm himself.

Under the circumstances of this case plaintiff was not required to use the magic word "suicide" in order to get to the jury. Plaintiff is entitled to have the jury decide whether it was foreseeable that Helmly might harm himself and, if so, whether the defendant sheriff exercised reasonable care to prevent such

harm. It was error to grant defendant sheriff's motion for summary judgment.

As to the County and the County Commissioners, plaintiff has failed to produce evidence which would prove that either the County or its Commissioners had any duty which was not met. Summary judgment was correctly granted for Alexander County and the County Commissioners.

Affirmed in part; reversed in part.

Chief Judge HEDRICK and Judge ARNOLD concur.